UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re:                                                          Chapter 7

ROBERT E. RICH,                                                 Case No. 05-45654 (ALG)

                                    Debtor.


------------------------------------------------------------x

GEORGE WACHTEL,
as Executor of the Estates of Ruth E.
Wolfert and Michael L. Wolfert,
both deceased,

                                    Plaintiff,


              - against -                                       Adv. No. 05-3153 (ALG)

ROBERT E. RICH,

                                    Defendant.

------------------------------------------------------------x

## MEMORANDUM OF OPINION

A P P E A R A N C E S:

GEORGE WACHTEL, *pro se*
Kuby & Perez, LLP
119 W. 23 St., Suite 900
New York, New York 10011

FEDER, KASZOVITZ, ISAACSON, WEBER, SKALA, BASS & RHINE LLP
Attorneys for the Defendant Debtor
    By:  David J. Mark, Esq.
750 Lexington Ave.
New York, New York 10022


**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

        This is an adversary proceeding in which the Plaintiff seeks a judgment against the

Debtor for investment losses and a determination that the debt is non-dischargeable or that the

Debtor should be denied a discharge altogether.  Before the Court are cross-motions for

summary judgment filed by the Plaintiff and the Defendant.

## BACKGROUND

The facts set forth herein are primarily taken from the Debtor's affidavit and certain

exhibits in the record relied on by the Plaintiff.

The Debtor is an accountant and former managing partner of J. Manning Winikus & Co.

("Winikus"), an accounting firm in New York.  The Plaintiff is the executor of the estate of Ruth

Wolfert (the "Decedent").  The Decedent served as the Debtor's psychotherapist from 1991 until

her death in February 2001 and apparently met the Debtor in that capacity.  In 1998, the Debtor

began preparing the Decedent's tax returns.

<u>Fund Transfers</u>

It appears that the Debtor discussed his investment activities with the Decedent.  From

June 1995 through December 1996, the Decedent made four transfers of funds totaling $169,500

to the Debtor or Winikus for investment.  For two of these transfers, the Debtor and the Decedent

executed a document, under Winikus letterhead, entitled "Fiduciary Receipt for Funds" (Pl.'s Ex.

B, the "Receipts").  It appears uncontested that the Decedent made two other transfers pursuant

to similar documentation.

The Receipts state, "Fiduciary has the responsibility to safeguard the funds and to deliver

to Depositor within ten (10) international banking days from the effective date hereof a tier one

bank Certificate of Deposit with a maturity of one year."  The Receipts further state, "If for any

good and valid reason whatsoever Fiduciary declines to invest the Funds in a Certificate of

Deposit, Fiduciary shall return depositor funds, including market interest, within ten (10)

2

international banking days from Effective Date hereof to Depositor and secure written receipts

for same." The Debtor signed each receipt; under his signature is the following:

> ROBERT RICH
> J. MANNING WINIKUS & CO.
> FIDUCIARY

The earliest Receipt in the record, dated by "Depositor" June 29, 1995, states the amount of the

deposit as "$110,000" and reflects the Decedent's election to be secured by receiving a

"Certificate of Deposit with agreed upon profit included in the face of the instrument with a

maturity value of $132,000." The other receipt in the record is for $25,000 and is dated by the

Decedent as "Depositor" December 28, 1995.

It is undisputed that neither the Debtor nor Winikus ever obtained a certificate of deposit

for the benefit of the Decedent or returned funds to her in accordance with the terms of the

Receipts. Instead, each time the Decedent transferred money to the Debtor during the period

from June 1995 through December 1996, the Debtor deposited the Decedent's money for a brief

period of time in an account belonging to Winikus, commingling it with other funds, and then

transferred it to a man named James George. The Debtor also transferred funds from other

investors to George, which, along with the money received from the Decedent, amounted to

approximately $400,000 (the "George Investment"). The Debtor claims that his purpose in

transferring the money to George was to acquire an interest in the profits connected with a future

redemption of certain U.S. Treasury Bonds (the "Bond Transaction"). The Debtor claims that

George represented and convinced him that a $400,000 investment in the Bond Transaction

would permit the investors to share in a prize of $6.25 million. The Debtor also asserts that

George actually created the Receipts that the Decedent signed.

The Plaintiff asserts that the Decedent was not aware that the transfers she made from June 1995 through December 1996 were to be placed in George's hands for "investment." The Debtor claims she was. In any event, the Debtor sent annual statements to the Decedent with regard to her $169,500 investment covering calendar years 1995 through 1999 (Pl.'s Ex. E, the "Statements"). The Statements were printed on Winikus letterhead and showed funds received and interest credited monthly on an account belonging to the Decedent. The rate of interest reflected in the Statements is consistently 8%. The first of the Statements, dated January 31, 1996, showed the Decedent's balance as of December 31, 1995 to be $161,905.10. The last of the Statements, dated July 24, 2000, showed the Decedent's balance as of December 31, 1999 to be $238,975.98.[1] It is not disputed that the Decedent never received any funds back from the Debtor, from Winikus, or from George.

George

The Debtor claims he introduced the Decedent to George some time after the Decedent's initial transfer of funds, and there is a written record of some contact between the two. In 1996 or 1997, the Decedent apparently formed a not-for-profit foundation called the Chrysalis Institute, of which the Debtor became an officer. (Def.'s Aff. at ¶ 4.) It appears that George also claimed to have a charitable trust, the Devonian Trust, and documents indicate that George committed to using his "best efforts" to acquire for the Devonian Trust real estate worth $2.5 million, which the Devonian Trust would "rent to" the Chrysalis Institute for $1 per year. George also committed to donate millions of dollars to the Chrysalis Institute if it met certain modest performance goals. (Def.'s Ex. C.) On April 15, 1997, the Decedent transferred an additional $75,000 directly to George, and pursuant to a signed agreement, George pledged to

---

[1] Neither party has fully explained these Statements. The Receipts show investments in certificates of deposit that would appear to have an effective rate of return of 20% and 25%, respectively. The Statements show interest accruing at a different rate, although they certainly do not reflect anything about an investment with George.

use this money to offset costs incurred by the Devonian Trust in assisting the Chrysalis Institute. However, there is no evidence in the record that George or the Devonian Trust provided anything of value to the Decedent, her heirs or the Chrysalis Institute.[2]

### Mintus

It is not contested that in 1998, the Decedent transferred to the Debtor or Winikus an additional $97,204.25 for investment with one Carolyn Mintus.[3]  The Debtor states that Mintus offered him and his clients an "investment opportunity" involving the purchase and resale of notes issued by "highly rated banks" in Europe.  (Def.'s Aff. at ¶ 27.)  According to the Debtor, Mintus claimed she could purchase the notes at a significant discount from face and then resell them in a matter of weeks at a substantial profit.  The Debtor transferred to Mintus, Inc. a total of approximately $2 million belonging to several of his clients, including $97,204 belonging to the Decedent (the "Mintus Investment") (Id. at ¶¶ 28-29).  The Debtor claims that he told the Decedent all the facts he knew relevant to the Mintus Investment, and as further discussed below, it is not part of the Plaintiff's claim that the Debtor withheld or concealed information from the Decedent about the Mintus Investment.  In any event, the Debtor received $282,250 in commissions from the Mintus Investment and claims the Decedent earned a total of $13,747 in the form of profit distributions.  Ultimately, the investors whom the Debtor introduced to Mintus lost the principal of their investment, although the Debtor alleges that he contributed $150,000 of his own money to his investment clients to help make up some of their losses.

---

[2]  This $75,000 is not, however, part of the Plaintiff's claim.
[3]  There is no dispute that Mintus was convicted of securities fraud in or about 2002 and is now serving a federal prison term.

<u>Litigation in State Court</u>

After the Decedent's death, the Plaintiff was appointed executor of her estate and has served as executor since that time.  In November 2001, the Plaintiff commenced an action (the "State Court Action") in the Supreme Court of the State of New York, County of New York, against the Debtor, Winikus, George, Mintus and others, seeking recovery of certain of the Decedent's investments.  During the discovery stage, the Plaintiff asked the Defendants to produce all documents pertaining to the Debtor's stewardship of the Decedent's deposits made in 1995 and 1996.  The Debtor responded that all such documents had been in a box that he had given to one of his clients who had participated in the George Investment in 1997 or 1998.  The Debtor claims that the client has been unable to locate the box.  (Def. Aff. at ¶ 26.)  In December 2002, the attorney representing the Debtor and Winikus in the State Court Action represented that the Debtor had searched his home and office and found no responsive documents.  The State Court Action is currently stayed.

<u>The Bankruptcy Case</u>

On October 12, 2005, the Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code.  On November 11, 2005, the Plaintiff filed a complaint against the Debtor, seeking recovery of $252,957.25, which includes the $169,500 placed in the George Investment and the $97,204.25 placed with Mintus, less the $13,747 return that the Decedent received in connection with the Mintus Investment.  The Plaintiff alleges that the claim against the Debtor is: (i) non-dischargeable under § 523(a)(2)(A) (obtaining money by false pretenses, a false representation, or actual fraud); (ii) non-dischargeable under § 523(a)(4) (fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny); (iii) non-dischargeable under § 523(a)(2)(B) (making false statements in writing concerning the debtor's financial condition);

6

and (iv) that the Debtor should be denied a discharge under § 727(a)(3) for failure to keep or preserve recorded information from which the Debtor's current financial condition and business transactions can be ascertained.[4]  The Plaintiff has moved for summary judgment on all four counts in the complaint.

The Debtor has also cross-moved for summary judgment on all counts in the Plaintiff's complaint, asserting that the complaint should be dismissed because (i) he did not have any fiduciary duties toward the Decedent, (ii) he never withheld or concealed from the Decedent a material fact about any investment, (iii) he never intended to deceive the Decedent, (iv) he performed due diligence with respect to the investments at issue, and (v) he never violated any fiduciary duties, assuming for the sake of argument that he had any.

For the reasons set forth below, the Court (i) denies the Plaintiff's motion for summary judgment, (ii) denies the Debtor's cross-motion for summary judgment in large part, and (iii) grants the Debtor's cross-motion only to the extent of dismissing the Plaintiff's claims under §§ 523(a)(2)(B) and 727(a)(3) of the Bankruptcy Code.

## DISCUSSION

In accordance with Bankruptcy Rule 7056, which incorporates Fed. R. Civ. P. 56, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Morenz v. Wilson-Coker*, 415 F.3d 230, 234 (2d Cir. 2005).  The moving party bears the burden of demonstrating the absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,

---

[4]   The Plaintiff has not sought a declaration of non-dischargeability under § 523(a)(19), added by the Sarbanes-Oxley Act, making certain securities fraud judgments non-dischargeable.

249 (1986); *see also Ames Dep't Stores, Inc. v. Wertheim Schroder & Co., Inc.*, 161 B.R. 87, 89

(S.D.N.Y. 1993).  A fact is considered material if it might affect the outcome of the suit under

governing law.  *See Anderson*, 477 U.S. at 248.  When the court considers a motion for summary

judgment, it must resolve all ambiguities and draw all permissible factual inferences in favor of

the party against whom summary judgment is sought.  *Heyman v. Commerce & Industry Ins.

Co.,* 524 F.2d 1317, 1318 (2nd Cir. 1975); *see also Ames Dep't Stores, Inc*., 161 B.R. at 89.

However, a party opposing a motion for summary judgment cannot rest on its pleadings but must

provide evidence to support the essential elements of its case.  *See Anderson*, 477 U.S. at 248;

*DePippo v. Kmart Corp.*, 335 B.R. 290, 294-95 (S.D.N.Y. 2005), citing *Matsushita Elec. Indus.

Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

I.      **Money Obtained by False Pretenses or Representations, or Actual Fraud; §
        523(a)(2)(A)**

Section 523(a)(2)(A) of the Bankruptcy Code, as applicable to this case, excepts from

discharge liabilities for money "obtained by false pretenses, a false representation or actual

fraud, other than a statement respecting the debtor's or an insider's financial condition."  A

creditor seeking an exception from discharge under § 523(a)(2)(A) must establish the following

elements of fraud by a preponderance of the evidence: (1) the debtor made a representation; (2)

the debtor knew the representation was false at the time it was made; (3) the representation was

made with the intent to deceive the creditor; (4) the creditor relied on the representation; and (5)

the creditor was injured by the representation and suffered damages as a result.  *In re Reider*, 178

B.R. 373, 376 (Bankr. S.D.N.Y. 1995); *In re Shareen*, 111 B.R. 48, 51 (S.D.N.Y. 1990).  Once a

creditor establishes a *prima facie* case of fraud, the burden of proof shifts to the debtor to show

the absence of fraud.  *Bethpage Fed. Credit Union v. Furio (In re Furio)*, 77 F.3d 622, 624 (2d

Cir. 1996).

The Plaintiff claims that a debt is owed to the Decedent's estate and is non-dischargeable under § 523(a)(2)(A) and that he has satisfied his burden as to the $169,500 invested with George by demonstrating that (i) the Debtor made fraudulent representations (in the Receipts) that this money would be invested in certificates of deposit, and (ii) as the Debtor has admitted, it was not. The fraud claim with respect to the $97,204 investment with Mintus is based on the assertion that the Debtor's transmission of periodic Statements representing that Decedent's initial investments were safe and growing at a rate of 8% caused her to transmit further funds at the Debtor's behest and made the Debtor in effect an aider and abettor of a breach of duty. The Debtor responds that Plaintiff's claims fail because (i) the Decedent knew the $169,500 would be placed with George for investment rather than in certificates of deposit, despite the language of the Receipts, and (ii) the Statements constitute representations made by George, not the Debtor, and it is therefore irrelevant whether or not they induced the Decedent to invest an additional $97,204 with Mintus.

The Debtor points to the following, among other things, as support for his claim that the Decedent was aware of the facts and knew her money would be used to invest in opportunities that George had produced: (i) the Debtor introduced the Decedent to George shortly after she advanced funds to him, and the Decedent later independently transferred $75,000 to George; (ii) there is no record that the Decedent ever demanded the return of her funds (placed with George); and (iii) the Decedent allegedly never complained about her failure to receive certificates of deposit. The Debtor further argues that the Decedent would not have made the additional transfer of $97,204 to Mintus had she not known what happened to her initial investment of $169,500. As discussed further below, the Debtor claims that he was misled by George as to the

soundness and the potential profitability of the Bond Transaction and therefore cannot be guilty of ill intent or liable for any false information contained in the Statements.

Notwithstanding the Debtor's assertions as summarized above, they obviously do not entitle him to summary judgment. While the Debtor may be able to submit evidence on these claims or some of them at a trial, Plaintiff is entitled at a minimum to test the credibility of the Debtor's self-serving and undocumented assertions. *See Cross v. United States*, 336 F.2d 431, 433-34 (2d Cir. 1964). It is especially difficult to conclude at this stage that the Debtor lacked the intent to deceive the Decedent given the language of the Receipts, which detail a relatively conservative transaction, as well as the admitted transmittal to the Decedent of the Statements on Winikus letterhead, evidencing an investment accruing interest at a flat rate.

The Plaintiff's motion for summary judgment must also be denied. While the Receipts speak for themselves, as the Plaintiff insists, they do not speak for the parties, or at least they are not the last word. They also do not explain why the imputed rate of interest on the certificates of deposit (20% and 25% for the two in the record) was so much higher than the 8% shown as accruing under the Statements for a much longer period of time than provided for in the Receipts. In light of the Debtor's affidavit about the facts surrounding the George Investment, the Court cannot conclude definitively on the present record that the Debtor obtained $169,500 from the Decedent by an actionable fraudulent misrepresentation.

Plaintiff's § 523(a)(2)(A) claim with respect to the $97,204 transferred to Mintus requires the same determination. The Plaintiff claims that this investment was induced by the false Statements transmitted by the Debtor, which represented that the Decedent's investment was accruing at a stable, relatively conservative rate. The Court rejects the Debtor's argument that the Statements do not constitute representations by him. The Debtor claims that the Decedent

10

understood George to be responsible for the funds in the Decedent's account, and that the

Statements were not guaranties by either the Debtor or Winikus that they were responsible for

making any payments.  Regardless of whether this is true, the Statements were issued by the

Debtor under the Winikus letterhead and constitute representations for purposes of §

523(a)(2)(A).  Nevertheless, for purposes of Plaintiff's *prima facie* case, the Plaintiff has not

established any other elements of fraud under § 523(a)(2)(A), namely, that the Debtor knew the

Statements were false, that the Statements were issued by the Debtor with the intent to deceive

the Decedent, or that the Decedent relied on the Statements in investing the additional $97,204

with the Debtor.  Thus the Plaintiff is not entitled to summary judgment.  Obviously, the Debtor

has also failed to establish his case conclusively, and he is not entitled to summary judgment

either. [5]

## II.    Fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; § 523(a)(4)

Section 523(a)(4), as applicable to this case, excepts from discharge any debt arising out

of an individual debtor's "fraud or defalcation while acting in a fiduciary capacity,

embezzlement, or larceny."  The Plaintiff claims that the debt owed to the Decedent is non-

dischargeable under this section because (i) the Debtor committed a defalcation in connection

---

[5]   The Court recognizes the difficulty that both parties will likely have in proving or disproving a fraud case
by virtue of New York's Dead Man's Statute, which provides in part:

> upon the trial of an action or the hearing upon the merits of a special proceeding, a party or
> a person interested in the event, . . . shall not be examined as a witness in his own behalf or
> interest, . . . against the executor, administrator or survivor of a deceased person or. . . a
> person deriving his title or interest from, through or under a deceased person . . ., by
> assignment or otherwise, concerning a personal transaction or communication between the
> witness and the deceased person . . . .

 N.Y. CPLR 4519.  Under the Dead Man's Statute, the testimony of an interested party as to personal transactions
with a decedent is inadmissible at trial.  In any event, this testimony can be considered by a court on a motion for
summary judgment.  *See Icahn v. Todtman, Nachamie, Spizz & Johns, P.C.*, 2001 U.S. Dist. LEXIS 15487, at *13
(S.D.N.Y. 2001).

with his fiduciary duties owed to the Decedent with respect to both the George Investment and

the Mintus Investment, and (ii) committed embezzlement with respect to the George Investment.

### A.   Defalcation while acting in a fiduciary capacity

With regard to defalcation, the first question is whether the Debtor was "acting in a

fiduciary capacity" within the meaning of § 523(a)(4).

### 1.   Fiduciary capacity

The definition of "fiduciary capacity" under § 523(a)(4) is a matter of federal law that is

informed by the state law governing the relationship between the debtor and the claimant.  A

debtor will only be considered a fiduciary for purposes of § 523(a)(4) if (i) he owes the

obligations of a fiduciary under applicable state law and (ii) the fiduciary relationship existed

prior to the act from which the underlying indebtedness arose.  *Davis v. Aetna Acceptance Co.*,

293 U.S. 328, 333 (1934); *In re Hyman*, 335 B.R. 32 (S.D.N.Y. 2005).  These requirements

demand a more narrow definition of "fiduciary" than that under state law, and not all agency

relationships will rise to a fiduciary level for purposes of § 523(a)(4).  However, the Second

Circuit has held that parties may stand in a fiduciary relationship for purposes of § 523(a)(4),

despite the lack of a technical or express trust.  *See Andy Warhol Foundation for Visual Arts, Inc.*

*v. Hayes (In re Hayes)*, 183 F.3d 162, 168-70 (2d Cir. 1999).  "[T]he 'technical or express' trust

requirement is not limited to trusts that arise by virtue of a formal trust agreement or statute

imposing an express trust, but includes relationships in which 'technical trust type' obligations

are imposed pursuant to a statute or common law."  *Shearson Lehman Hutton v. Schulman (In re*

*Schulman)*, 196 B.R. 688, 697 (Bankr. S.D.N.Y. 1996); *see also Bruce Supply Corp. v. Kofsky*

*(In re Kofsky)*, 2006 Bankr. Lexis 2280 (Bankr. S.D.N.Y. Sept. 19, 2006).

The Debtor claims that he was not the Decedent's fiduciary but merely an intermediary between the Decedent and George in the one instance and the Decedent and Mintus in the other. Notwithstanding his protests, the written record together with the Debtor's admissions on this motion demonstrate that the Debtor was acting in a fiduciary capacity for purposes of § 523(a)(4) as the Decedent's investment consultant and, as of 1998, her accountant.  The Debtor became the Decedent's fiduciary when she began her investment activity in 1995 by entrusting him with funds, as documented by the Receipts.  The Receipts plainly evidence the fiduciary obligations running from the Debtor to the Decedent in that they are denominated "Fiduciary Receipts for Funds" and identify the Debtor, as a partner of Winikus, as "fiduciary."  (Pl.'s Ex. B.)  The Debtor had control over the Decedent's investment funds and claims that he placed them in the George Investment.  Whether or not this was done with the Decedent's consent, it is well accepted that an investment advisor stands in a fiduciary relationship with his client.  *See In re Zois*, 269 B.R. 89, 101 (Bankr. S.D.N.Y. 1999) (where the Court found that a creditor's "lawyer, business manager, agent, accountant and bookkeeper" was a fiduciary under § 523(a)(4) because he "was entrusted with control over her property and had an ethical contractual duty to uphold."); *see also In re Schneider*, 99 B.R. 974 (9th Cir. B.A.P. 1989) (debtor, as financial advisor, was in a fiduciary relationship under § 523(a)(4) with client whose funds he eventually converted); *In re Schulman*, 196 B.R. at 698.  Moreover, this fiduciary relationship continued up to the time of the Mintus Investment in 1998, given the Decedent's history with the Debtor as her investment advisor and, by this time, her accountant.[6]

---

[6]  It should also be noted that the New York Supreme Court ruled in a prior case that the Debtor and Winikus stood in a fiduciary relationship with another client who had participated in the Mintus Investment.  *L.H.P. Realty Co. v. Rich*, 2001 N.Y. Slip Op. 40326U at 5-6, 2001 N.Y. Misc. LEXIS 595, at *9 (N.Y. Sup. Ct. Aug. 28, 2001) ("Here, given the defendants' superior knowledge regarding plaintiffs' investment with Mintus, the fact that the investment was made through the defendants, and the fact that they assured LHP that its principal would not be put at risk, plaintiffs have stated a valid cause of action for breach of fiduciary duty…..").  Although this decision is not binding for § 523(a)(4) purposes, the state court's reasoning is the same as that set forth herein.

In light of the above, the Court finds that the Debtor owed the Decedent fiduciary duties that would subject his actions to potential liability under § 523(a)(4). The next question is whether there was a defalcation as to those duties.

### 2.   Defalcation

Although the Bankruptcy Code does not define "defalcation," courts have held that it "requires more than mere negligence, and cannot be a completely innocent act. While defalcation may not require actual intent, nor may it rise to the level of misappropriation, it does require some level of mental culpability." *Denton v. Hyman (In re Hyman)*, 335 B.R. 32, 40 (S.D.N.Y. 2005), quoting *Zohlman v. Zoldan (In re Zoldan)*, 226 B.R. 767, 777 (1988); *see also In re Daly*, 247 B.R. 369, 380 (Bankr S.D.N.Y. 2000); *see also Rutanen v. Baylis* (*In re Baylis*), 313 F.3d 9, 20 (1st Cir. 2002); *Schwager v. Fallas* (*In re Schwager*), 121 F.3d 177, 185 (5th Cir. 1997); *Meyer v. Rigdon*, 36 F.3d 1375, 1384-85 (7th Cir. 1994); *In re Kofsky*, 2006 Bankr. Lexis 2280, at *6-*7. The question of defalcation within the meaning of § 523(a)(4) has to be considered with respect to both the George and the Mintus Investments.

### a.   George Investment

With regard to the George Investment, Plaintiff claims that the Debtor violated his duty of loyalty by misappropriating the Decedent's $169,500 for his own benefit. The Plaintiff relies on the fact that an investment entirely different from the scheme that the Debtor recounts is provided for in the Receipts, in the following language:

> Fiduciary has the responsibility to safeguard the funds and to deliver to Depositor [the Decedent] within ten (10) international banking days from the effective date hereof a tier one bank Certificate of Deposit with a maturity of one year …. [I]f for any good and valid reason whatsoever Fiduciary declines to invest the Funds in a Certificate of Deposit, Fiduciary shall return depositor funds, including market interest, within ten (10) international banking days from Effective Date hereof to [the Decedent] and secure written receipts for same.

14

(Pl.'s Ex. B.)  The Plaintiff further alleges, as proof of the Debtor's bad faith, that the Debtor transferred the Decedent's money, along with money of other investors, to George in the hopes of receiving a windfall of over $5 million if George completed the Bond Transaction and fulfilled his promise to share the profits with the Debtor.  The Plaintiff notes that the Debtor admits that the Decedent's money was transferred to George not in her name but in the name of Winikus, the Debtor's partnership. (Def. Aff. at ¶ 14.)  Thus, the Plaintiff claims, the Debtor planned to make millions for himself and then return to the Decedent, at most, the face value of the promised certificates of deposit.  Alternatively, the Plaintiff claims that even if the Debtor intended to share equitably any profits with the Decedent, he violated his duty of obedience to the Decedent as his principal by investing the funds with George rather than in certificates of deposit in accordance with the terms of the Receipts.

The Debtor responds that, despite extensive due diligence, he was misled by George and unwittingly led his clients to make a mistake by participating in the George Investment.  The Debtor claims that his due diligence consisted of: (i) confirming the existence of the U.S. Treasury Bonds that would allegedly be redeemed; (ii) speaking directly with a "person" who George claimed to be an intermediary for the holders of the U.S. Treasury Bonds; (iii) sending a business consultant to Europe to verify parts of George's story; (iv) checking police records as to George's background; and (v) speaking to a director of a Dreyfus mutual fund about George generally.  (Def.'s Aff. at ¶ 7; Tr. of Def.'s Deposition at 47-48.)  The Debtor also asserts that the Decedent specifically asked to participate in the George Investment because she saw it as an opportunity to raise funds to promote the Chrysalis Institute.  The Debtor claims that he did not attempt to mislead the Decedent about the nature of the George Investment and relayed to her

15

information regarding his discussions with George and his efforts to substantiate the information

that George had provided about the investment opportunity.  (Def.'s Aff. at ¶¶ 8-10.)

The Debtor further attempts to buttress his argument that the Decedent knew her money

would be invested with George by describing the "purpose" of the Receipts.  He states that they

were prepared by George and were "intended for record keeping purposes and to protect the

investors until the funds were transferred" to George. (Def.'s Aff. at ¶ 14.)  According to the

Debtor, Winikus planned to invest the funds in certificates of deposit only "in the event there

was a significant length of time until the funds were transferred" to George. (Def.'s Aff. at ¶ 16.)

The Debtor states that the Decedent never received or became the beneficial owner of certificates

of deposit because the funds were invested with George within a few weeks of their being

entrusted to the Debtor.

For purposes of Plaintiff's motion for summary judgment, the Court finds that the

Plaintiff has stated a *prima facie* case of defalcation but that the Debtor's defenses cannot be

rejected on motion, notwithstanding their apparent inconsistency with the Receipts and the

Statements.  On the Plaintiff's motion, the Court must give the Debtor the benefit of all

reasonable inferences, as a result of which it is possible that (i) the Decedent knew her money

would be placed in the George Investment and never expected to receive certificates of deposit if

it was; and (ii) the Debtor reasonably believed he was acting within the authority given him by

the Decedent when he transferred the Decedent's money to George.  If the Decedent had directed

the Debtor to entrust her money to George, despite the terms of the Receipts, he would have been

under a qualified duty not to violate this direction and his breach of the terms of the Receipts

could not be considered wrongful conduct or a defalcation.  *See In re Hyman*, 320 B.R. at 501;

*see also* Restatement 2d, *Agency* §§ 383, 385, comment d.  For purposes of summary judgment,

Plaintiff has not proven as a matter of law that the Debtor's investment of the Decedent's money with George constituted a defalcation of fiduciary duty under § 523(a)(4), and the Debtor is entitled to have his credibility tested in open court. The portion of the Plaintiff's motion that seeks an order establishing that the transfer of funds to George constituted a defalcation must be denied.

Moreover, the Plaintiff's argument that the Debtor's explanations with regard to the Receipts are inadmissible by virtue of the parol evidence rule has no basis. Under New York law, the parol evidence rule provides that the unambiguous terms of a fully integrated written contract cannot be contradicted by extrinsic evidence of agreements made prior to or contemporaneous with the execution of the contract. *See U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 571 (2d Cir. 1991). The Plaintiff claims that the Receipts constitute an unambiguous integrated contract and that the Debtor's statements about the purpose of the Receipts – i.e., that they were only intended to evidence receipt of money, which was to be held until the George Investment could be effected – constitute inadmissible parol evidence. However, the Receipts are not integrated contracts. *See LTV Corp. v. Aetna Casualty & Surety Co. (In re Chateaugay Corp.)*, 116 B.R. 887, 903 (Bankr. S.D.N.Y. 1990) ("Integration is determined by whether the terms of the contract are clear, definite, and complete on their face.") (citing 3 *Corbin on Contracts* at § 579); *see also Komp v. Raymond*, 175 N.Y. 102, 109, 67 N.E. 113, 115 (1903) ("That such a receipt, being an informal and non-depositive writing, may be modified, explained or contradicted by parol, is well established by the authorities in this state and elsewhere.") (internal citations omitted); *Verstandig & Sons, Inc. v. Sobel*, 26 Misc. 2d 649, 652, 206 N.Y.S.2d 860, 864 (Sup. Ct. N.Y. Co. 1960). In any event, parol evidence is admissible to prove waiver. *See Northeast Petroleum Division of Cargill, Inc. v. Bear Stearns*

*New York, Inc.*, 1994 U.S. Dist. Lexis 9830, at *14, n. 4 (S.D.N.Y. 1994); *see also Imperator Realty Co., Inc. v. Tull*, 228 N.Y. 447, 453, 127 N.E. 263, 265 (1920); *Taylor v. Blaylock & Partners, L.P.*, 240 A.D.2d 289, 659 N.Y.S.2d 257 (1st Dept. 1997).

The Debtor's cross-motion as to the George Investment must also be denied. The Debtor asks the Court to find beyond dispute the truth of his assertion that he fully disclosed all relevant details about the George Investment to the Decedent and that the Decedent manifested her consent, orally, to her money being transferred to George. Certainly the factual record on these motions does not establish this as a matter of law, and the credibility of the Debtor's testimony is genuinely in dispute. It has long been established that the party opposing a summary judgment motion should have an opportunity to cross-examine the movant in the presence of the finder of fact when the credibility of the movant's self-serving, material testimony is genuinely at issue. *Cross v. United States*, 336 F.2d 431, 433-34 (2d Cir. 1964). In this case, not only is the Debtor's testimony self-serving, but the documentary record is generally inconsistent with his assertions.

### b. Mintus Investment

The Plaintiff also argues that the Debtor committed a defalcation of fiduciary duty with respect to the Mintus Investment. Specifically, the Plaintiff alleges that the Debtor (i) breached his duty of care by failing to perform due diligence as to the Mintus Investment prior to recommending that the Decedent's money be placed with Mintus and (ii) breached his duty of candor by using the Statements in connection with the George Investment to mislead the Decedent about his skill as an investment advisor. These Statements, the Plaintiff contends, also violated the duty to provide information, described as the duty of an agent "to use reasonable efforts to give its principal information relevant to the affairs that have been entrusted to it."

*Conway v. Icahn & Co.*, 16 F.3d 504, 510 (2d Cir. 1994), citing Restatement (Second), <u>Agency</u> §
381 (1958).  The Plaintiff alleges that in the absence of either of these breaches the Decedent
would not have authorized the Debtor to place her money with Mintus in 1998.

With regard to due diligence, the Debtor claims that he took the following steps to
ascertain the safety of the Mintus Investment: (i) he inquired about Mintus at Citibank, where
they both had accounts, and concluded that Citibank found her reliable; (ii) he contacted the
references provided by Mintus and was told that she was responsible and reliable; (iii) he met
with Mintus several times and brought a business associate with him; they both allegedly felt that
Mintus was sincere; and (iv) he examined records of Mintus' prior investments, which allegedly
reflected enormous profits.  (Def.'s Aff. at ¶ 27.)

Although the Debtor has not provided documentation to back up his assertions, the Court
cannot discredit the Debtor's testimony at the summary judgment stage and grant the Plaintiff's
motion.  This is especially true because there is no contention that the Decedent did not know her
money was to be invested with Mintus.  In fact, the Debtor claims that the Decedent knew that
none of her money was held by Winikus and that the Statements did not represent the value of
funds held by Winikus or promised by Winikus to the Decedent.  (Def.'s Aff. at ¶ 21.)  Although
the Plaintiff may be able to prove at trial that the Debtor engaged in misconduct that rises to the
level of defalcation, construing the facts in a manner that resolves all reasonable inferences in the
Debtor's favor, the Plaintiff's motion for summary judgment on his claim that the Debtor was
guilty of defalcation with respect to the Mintus Investment must be denied.

Likewise, the Debtor's cross-motion on this claim must be denied for the reasons
discussed above with respect to the George Investment.  The Debtor is not entitled to judgment
based on his own self-serving affidavit in the record.

## B.      Embezzlement

To succeed on a claim for embezzlement under § 523(a)(4), the creditor objecting to discharge must prove a (i) misappropriation of funds (ii) for the debtor's own purposes (ii) by fraudulent intent or deceit. *Gore v. Kressner (In re Kressner)*, 155 B.R. 68, 74 (Bankr. S.D.N.Y. 1993). The Plaintiff claims that the Debtor embezzled $169,500 from the Decedent by investing her funds with George. However, as found above with respect to claims of defalcation, the Court cannot conclude at this stage that the Debtor's investment of the Decedent's $169,500 did or did not constitute a misappropriation of funds for the Debtor's own purposes. On one hand, the Debtor claims that he shared all relevant information with the Decedent and acted at her behest by investing her money with George rather than complying with the terms of the Receipts and investing Decedent's money in certificates of deposit. On the other hand, one could reasonably discredit the testimony of the Debtor in this regard and infer from the Receipts that the Decedent consented only to the investment of her money in certificates of deposit. A genuine issue of fact exists as to whether the Decedent consented to participate in the George Investment, and both motions for summary judgment on the Plaintiff's claim of embezzlement are denied.

## III.     Money Obtained by Use of a False Financial Statement; § 523(a)(2)(B)

The Debtor has also moved for summary judgment dismissing the Plaintiff's cause of action under § 523(a)(2)(B) of the Bankruptcy Code. Section 523(a)(2)(B), as applicable to this case, provides:

> A discharge under section 727 . . . does not discharge an individual debtor from any debt for money . . . to the extent obtained by use of a statement in writing that is materially false; respecting the debtor's or an insider's financial condition; on which the creditor to whom the debtor is liable for such money . . . reasonably relied; and that the debtor caused to be made or published with intent to deceive.

The Plaintiff specifies two "statements in writing" as the predicate for a denial of discharge under § 523(a)(2)(B).  First, the Plaintiff points to an email dated August 22, 2001 sent to him personally, as the Decedent's executor, in which the Debtor states that he had invested $336,180 of the Decedent's money with Mintus, Inc.  (Pl.'s Ex. G.)  Although the Debtor claims that he later retracted this statement as a mistake, Plaintiff asserts that the Debtor sent the email as an attempt to deceive him into believing that all funds invested by the Decedent had been transferred to Mintus, when in actuality some of these funds had been transferred to George.  The Plaintiff alleges that he relied on the Debtor's misrepresentation to his detriment by failing to bring a timely lawsuit against George.  The Plaintiff goes on to argue that the Debtor also attempted to deceive the Decedent by issuing the Statements, which showed "phantom gains" and effectively masked the fact that the Debtor had lost $169,500 of the Decedent's money in the George Investment.  (Pl.'s Mem. of Law at 11.)   The Plaintiff claims that the Decedent must have relied on the Statements and that this is borne out by the fact that she subsequently entrusted the Debtor with an additional $97,204, which was invested with Mintus.

Although the Plaintiff argues that the email and the Statements were false representations that were intended to, and did, deceive the Plaintiff and the Decedent, he has not explained how either misrepresented the Debtor's financial condition, as required by § 523(a)(2)(B)(ii).  That subsection plainly requires that the financial statement involve "the debtor's or an insider's financial condition."  The Second Circuit has identified two possible constructions of the scope of the term "financial condition" as used in § 523(a)(2)(B)(ii).  *Schneiderman v. Bogdanovich* (*In re Bogdanovich*), 292 F.3d 104, 112 (2d Cir. 2002) "A broad interpretation would include any statement that reflects the financial condition of the debtor.  On the other hand, a narrow interpretation would find that a statement relates to financial condition only when it provides

21

information as to a debtor's overall financial health." *Id.* (internal quotation omitted).

Application of either interpretation demonstrates that neither the email nor the Statements

concern the financial condition of the Debtor.  The Plaintiff argues, plausibly, that the Statements

are representations by the Debtor and Winikus that the Decedent's money was safe and growing.

(Pl.'s Mem. Law Supp. Summ. Judg. at 11.)  However, as these are not representations about the

Debtor's financial condition, the Plaintiff's claim under § 523(a)(2)(B) must be dismissed.

## IV.      Failure to Keep or Preserve Books or Records; § 727(a)(3)

The Plaintiff's final claim is that the Debtor should be denied a discharge of all of his

debts under § 727(a)(3) of the Bankruptcy Code.  Section 727(a)(3), as applicable to this case,

provides:

> The court shall grant the debtor a discharge, unless the debtor has concealed,
> destroyed, mutilated, falsified, or failed to keep or preserve any recorded
> information, including books, documents, records, and papers, from which the
> debtor's financial condition or business transactions might be ascertained, unless
> such act or failure to act was justified under all the circumstances of the case.

Section 727(a)(3) was enacted to prevent a debtor from abusing the protections of a bankruptcy

filing by failing to disclose his present financial condition and those business transactions

relevant to the cause of his financial difficulty.  "The purpose of this section is to provide

creditors and the court complete and accurate information concerning the status of the debtor's

affairs and to test the completeness of the disclosure relevant to discharge, and to ensure that the

trustee and creditors receive sufficient information to trace a Debtor's financial history for a

reasonable period past to present." *Jacobowitz v. Cadle Co. (In re Jacobowitz)*, 309 B.R. 429,

436 (S.D.N.Y. 2004) (internal quotations and citations omitted).

The Plaintiff claims that the Debtor should be denied a discharge pursuant to § 727(a)(3)

because the Debtor unjustifiably failed to preserve records concerning his placement of $169,500

of the Decedent's money with George.  As noted above, the Debtor claims that all written and electronic records of his business activities regarding the George Investment have been lost. Whatever the credibility of the Debtor's position, § 727(a)(3) is aimed at the preservation of records for the purpose of ascertaining a debtor's current financial condition, not evidence that may be relevant to an adversary proceeding where a creditor objects to the discharge of a debt. The George Investment occurred almost ten years prior to the commencement of the Debtor's bankruptcy case, and Plaintiff has failed to demonstrate that the records at issue would be relevant to the Debtor's current financial condition, or that his financial condition, in any event, is a disputed issue in this adversary proceeding.  *See In re Jacobowitz*, 309 B.R. at 436.  The Plaintiff's claim under § 727(a)(3) must also be dismissed.[7]

## CONCLUSION

For the reasons stated above, the Plaintiff's motion for summary judgment is denied.  The Debtor's cross-motion for summary judgment is granted only with respect to the Plaintiff's claims under §§ 523(a)(2)(B) and 727(a)(3) of the Bankruptcy Code and is otherwise denied. The Debtor is directed to settle an appropriate order on five days' notice.

Dated: New York, New York
        October 5, 2006

        _/s/ Allan L. Gropper_____
        UNITED STATES BANKRUPTCY JUDGE

---

[7]   The Plaintiff has also claimed that the Debtor has purposefully destroyed evidence.  Whether the Plaintiff can make out a claim for spoliation of evidence is a separate issue not before the Court on these motions.